*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MAHA CHIDIAC,

Plaintiff-Appellee,

v

NAJI CHIDIAC,

Defendant-Appellant.

UNPUBLISHED
June 08, 2026
9:41 AM

No. 371259
Oakland Circuit Court
Family Division
LC No. 2022-511327-DO

Before: YOUNG, P.J., and BORRELLO and TREBILCOCK, JJ.

PER CURIAM.

Defendant, Naji Chidiac (husband), appeals as of right the trial court's judgment of divorce that included the terms of a domestic relations arbitration award, and all subsequent corrections and clarifications to the award. On appeal, husband argues that the arbitrator failed to compensate him for his premarital contributions to the two dental practices belonging to plaintiff, Maha Chidiac (wife). Husband next argues that the arbitrator erred by declaring void the express contract granting him an ownership interest in one of wife's practices, Modern Dental (Modern). Finally, husband argues that the arbitrator impermissibly valued Modern based on the sale price of wife's first practice, Brite Dental Care (Brite). For the reasons set forth in this opinion, we affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

Wife is a dentist, and husband is an engineer and real estate agent. The parties married in October 2018 and had no children during the marriage, although each had two daughters from previous marriages. On January 26, 2022, wife filed for divorce. Of their assets accumulated before and during marriage, one of the areas of greatest contention was Modern's valuation and the parties' associated compensation.

Before meeting husband, wife opened Brite in Canton in 2007. She sold that practice during the marriage in 2019 for $290,000. In the meantime, on March 3, 2015, Modern opened for business. Wife was the sole owner of the practice on paper. The extent to which husband assisted with opening and operating Modern was disputed during arbitration. As proof of the benefit he provided to Modern, husband provided an e-mail wife sent to herself on August 25,

-1-

2015, then forwarded to husband on October 16, 2015, to evidence Modern was a joint venture the parties owned together. The e-mail, which did not have a subject line, stated:

> Investment of $$ 150K after all costs considered
> 25% = 37.5K
> Write agreement or not for this one?-personal only
> End of year distribution – tax implications-
> salary—whatever I pay myself—you get 25%—but how?? 1099? cut personal check after tax? tax implication of personal income??
> cash we take??—only cash pts-noninsurance once in a while 75/25. i will determine when and who.
> Credit card we use—if for personal- will consider as income toward final number
>
> Goals- together
> My income- MDC 75%
> Naji- his job and MDC 25%
>
> Together build supplemental business and income with equal investments
> Maha- manage clinical
> Naji- manage business end
> 3rd dental business – buy existing – run as 50/50 with new doctor working with staff
> 4th… same
>
> BDC [Brite Dental Center]
> running as always
> sell BDC—2yrs from now
> full time at MDC [Modern Dental Center] and will be my living income only

As further evidence of his contributions toward opening Modern, husband also submitted to the trial court a screenshot of a Facebook post written by wife on October 12, 2015, which stated:

> What can i say about the man that brings dreams to reality! Takes charge and make things happen! Says "yes we can" when i feel we can't. Makes difficult things look easy. Has made my life more simple and sweet! Naji Chidiac. Congrats to us for making Modern Dental a reality! Now when do we celebrate???

Wife testified the Facebook post was written to "boost [husband's] ego." Wife asserted that before the parties married, husband's role at Modern was "limited to managing payroll and making runs to the bank for deposits and the close of business, and generally consisted of no more than 1-2 hours per week," while wife had "always employed a full-time office manager to handle all of the other [] day-to-day operations of [Modern.]" Husband argued he worked over 20 hours per week managing Modern and worked with wife on plans to open more practice locations. Wife said she paid husband $800 per month through Zelle between 2016 and 2018 before they were married for assistance with managing Modern.

Wife explained that, in 2020, the parties created Modern Management Services, Inc., which had no income or assets of its own, but was used to service Modern's payroll. Each month, Modern transferred funds to Modern Management Services to consolidate payroll in anticipation of opening additional practices. Wife alleged that, after the parties married, husband "began taking advantage of [his] access [to Modern], including incurring exorbitant personal expenses on a company credit card and paying himself a salary which he surreptitiously deposited into a separate bank account." For example, when husband assisted Modern in applying for and obtaining a Paycheck Protection Program Loan, wife accused husband of exaggerating the financials he submitted on Modern's behalf, which resulted in an unforgiven liability of over $100,000 for Modern. Wife accused husband of embezzlement, which he allegedly committed by paying for his personal vehicle with funds transferred to Modern Management Services, and adding himself to Modern's payroll while secreting his "salary" in a separate account held solely in his name. Wife also accused husband of stealing money from Modern when he picked up the practice's cash and check receipts each week for deposit in Modern's Bank of America account. After discovering husband's alleged theft in November 2021, wife terminated husband's access to Modern's business accounts and credit cards and resumed handling payroll. Wife estimated husband stole over $50,000 from Modern by withholding cash and check deposits from the practice and keeping them for himself.

After wife filed for divorce in January 2022, the trial court issued ex parte orders directing the parties to refrain from selling, hiding, or transferring their assets. In objection to the orders, husband alleged theft by wife from Modern. Husband argued that, before wife filed for divorce, she withdrew assets from Modern's bank account, including a $300,000 wire transfer on December 29, 2021, to a different financial account under her exclusive control. She also, according to husband, terminated his access to all documents and data at Modern despite the fact that he "routinely manag[ed] financial and banking operations of the practice and play[ed] an integral role" in the business. Husband further alleged that wife "altered the marital financial status quo by ceasing to remit payments to [husband] for his management and other services related to their joint undertaking of operating Modern . . . ." So, husband asked that the trial court order wife to immediately account for the $300,000 she removed from Modern's bank account and preserve the funds in an agreed-upon or court-ordered financial account for the benefit of the marital estate.

Wife responded to these allegations by stating that she made the $300,000 wire transfer because she switched to a nearby Huntington Bank branch after the local Bank of America branch she had been using closed down. She also argued that husband's abuse of his access to Modern was the reason she filed for divorce, and the business decisions following her discovery of the abuse were done to mitigate potential criminal or civil liability and to protect both Modern and her license to practice dentistry. The parties later stipulated to restore husband's salary from Modern by disbursing $1,200 biweekly from Modern into a shared Bank of America savings account, and $1,065 monthly to cover husband's vehicle payment. Wife did not comply with the order, and the Bank of America records were later subpoenaed.

A bench trial began on January 24, 2023. After opening statements and brief testimony by wife, the parties agreed to adjourn trial and submit the case to matrimonial arbitration. As required under MCL 600.5072(1), the parties acknowledged that arbitration is binding, the right of appeal is limited, that they waived their right to a formal arbitration hearing, and that the rules of evidence would be suspended. They also acknowledged that the arbitration award may not be set aside

unless the trial court found one or more of the four circumstances listed in MCL 600.5081(2) were present.

## A. ARBITRATION PROCEEDINGS AND AWARD

Arbitration was conducted on 10 dates beginning in March 2023 and ending that June. The parties continued living in the marital home until April 11, 2023, just after arbitration began. Any transcripts of the arbitration proceedings were not transmitted to the trial court or to this Court, but the parties submitted closing arbitration briefs, and the arbitrator summarized her findings in a 45-page arbitrator's award dated September 12, 2023. The award covered the disposition of the parties' various personal properties, rental properties, businesses, bank accounts, vehicles, debts, personal property, and whether to award attorney fees.

The arbitrator opined that both parties played a role in the breakdown of the marriage and found that because both parties had the means to support themselves, invasion of separate property was not warranted under MCL 552.23. At the outset Modern was awarded by the arbitrator to wife "free and clear of any future claims or interest of [h]usband," because Michigan law "prohibit[s] ownership of a dental practice by someone that is not a licensed dentist."

Regarding the role husband played at Modern, the arbitrator found that neither party was completely credible. The arbitrator observed that husband provided no substantive evidence to support his testimony that he worked 20 hours per week at the practice on top of working full time as an engineer and selling real estate. However, the arbitrator observed that wife's testimony that husband worked 1-2 hours per week and was fully compensated $800 per month via Zelle from 2016 to 2018 was supported because husband did not receive a W-2 tax form from the practice until 2019. And although husband "spent considerable time testifying about and eliciting testimony regarding events dating as far back as 2008, 2012 and 2015," the arbitrator reasoned that, because Michigan does not recognize common law marriages and it must look at the period that began with the marriage, husband could not be awarded a share in the practice for work done before the parties were married. The arbitrator thus concluded that husband had been compensated for his work related to the dental practices before marriage.

Next, the arbitrator decided that the e-mail from October 2015 could not be a valid contract because it did not satisfy the Statute of Frauds, MCL 566.132. The purported contract was deemed "void," with "no implications in this divorce."

Finally, the parties disagreed about the value of Modern, with each party presenting expert testimony that arrived at differing valuations for the practice. Wife's expert, Christine Hoppe, utilized an adjusted book valuation of the practice, basing the valuation of Modern on the sale price of Brite, which she concluded was similar in terms of its size, location, patient demographics, revenue, and profitability. Hoppe included goodwill in her valuation, a factor that was deemed to have been "the main value" used in arriving at the purchase price of Brite in 2019. Husband's expert, John Alfonsi, contended that Hoppe's valuation was flawed because the locations and patient demographics of the two practices were meaningfully different. Utilizing a "holder's interest" valuation of the practice, Alfonsi testified that Hoppe's valuation was ultimately flawed because Modern was not, in fact, for sale.

After considering the experts' testimony, the arbitrator opined that

> [n]either valuation is completely justifiable based upon the facts and circumstances of this case. However, Ms. Hoppe's valuation is more justifiable because Brite [] and Modern [] are virtually the same dental practice, run by the same person just located in different cities. If Wife chose to sell the practice, the methodology is already predetermined based upon the sale of Brite and goodwill is a significant factor. Husband does not want to acknowledge that goodwill is a factor in this evaluation; however, in any valuation of the practice that provides a service, such as dentistry, it must be considered. But for the goodwill of Wife, there would be no practice. The arbitrator finds that any contributions that Husband made to the building or growth after the practice prior to the marriage, he has received compensation for, as discussed herein.

> Therefore, the arbitrator finds the marital value of Modern is $132,666 plus $29,505 to be reimbursed from the balance of the escrow account for a total of $162,171. Each party shall be awarded $81,085.50.

Finally, the arbitrator declined to award either party attorney or expert fees. Two weeks later, husband filed a motion to correct alleged errors or omissions in the award under MCL 600.5078(3).

## B. HUSBAND'S CHALLENGES TO THE ARBITRATION AWARD

Husband argued that the arbitrator made numerous errors in the attorney and expert fees portion of the award, with wife paying her attorney fees from marital resources, "including significant monies she paid herself from Modern [] to reduce the value of the business . . . ." According to husband, the arbitrator erred by ignoring that, shortly after filing for divorce, wife significantly reduced the value of the practice by diverting at least $300,000 in funds.

Husband also cited a number of financial transactions to show the arbitrator further erred by ignoring proof that wife paid out "specific identifiable annual dollar amounts for 2016, 2017, 2018 and 2019 consistent with the percentages she intended to pay [husband]" according to the 2015 e-mail. Next, husband argued the arbitrator erred by concluding that the payroll husband received for services performed on behalf of Modern should be the extent of his payout from Modern in the final divorce award. Husband further argued the arbitrator erred in considering Hoppe's expert testimony more credible than Alfonsi's, insisting that Hoppe's method of comparing Modern to Brite was flawed and undervalued Modern. Finally, husband argued the arbitrator erred in concluding that Alfonsi did not want to use goodwill as a factor in Modern's valuation, and that goodwill was "implicitly" used in Alfonsi's evaluation.

Wife's response to the motion, and the transcript of any hearing that may have occurred, are not available in the lower court record. The arbitrator granted husband's motion in part. The arbitrator awarded husband attorney and expert fees because wife used marital funds to pay her attorney and expert fees to husband's detriment. The arbitrator directed wife to pay husband and his attorney $86,550 "representing an equal share of the marital income and funds used to pay her attorneys and experts in this matter," within 30 days of entry of a judgment of divorce. As to the valuation of Modern, the arbitrator stated:

The motion to correct an error or omission regarding the marital value of Modern Dental Practice is denied. The arbitrator considered all of the evidence submitted and applied the standards as dictated by Michigan Law. Further, the arguments as set forth by [husband] are neither errors nor omissions, but motions for reconsideration that are not permitted pursuant to the Domestic Arbitrations Act, MCL 600.5070, *et seq*.

On November 21, 2023, husband brought a second motion to correct the arbitration award and decision issued October 31, arguing they both reflected the arbitrator was "improperly influenced by [wife's] fraudulent acts and presentation," which resulted in errors of law. Specifically, husband argued that wife "systematically drained [Modern] of the bulk of its cash reserves throughout 2022, contrary to the historical operations of the practice and in contravention of the January 26, 2022 Mutual Restraining Order." Husband's expert testified during arbitration that wife increased her compensation by $186,127 after she filed for divorce, and depleted Modern's cash on hand from $329,253 in December 2021 to only $47,105 in December 2022. Wife testified she did this upon the recommendation of her financial advisor, which husband argued the arbitrator failed to consider in valuing the growth of the practice during the marriage. Husband also pointed out the arbitrator wrote "[n]either valuation is completely justifiable based upon the facts and circumstances of this case," yet the arbitrator "wholeheartedly adopted [wife's] reduced valuation absent consideration of the $320,000+ [wife] depleted from the practice during 2022 after filing for divorce." Husband also challenged the trial court's reliance on the 2019 sale of Brite in Canton as a benchmark for value despite extensive testimony from husband's expert outlining significant distinctions between the practices.

Finally, husband argued the arbitrator misconstrued the law when she concluded that husband's expert's valuation "could not be relied upon as it considered [h]usband's premarital involvement, something that cannot be considered in the valuation of a marital asset." Husband argued that his expert used a date of marriage valuation of $225,000 and an end valuation of $862,200, without making any assertion that Modern's valuation was tied to husband's premarital involvement.

The trial court heard oral argument on the second motion to correct the arbitration award on December 12, 2023. Husband argued that under MCL 600.5081(2), which lists the four limited grounds to set aside or correct an arbitration award, the award was procured by "undue means," specifically "partiality" toward wife. Husband argued the arbitrator was "clearly biased" in favor of wife "every step of the way," did not do what was equitable, and made rulings that were not supported by the evidence, placing these events squarely within the circumstances listed in MCL 600.5081(2). Wife's counsel responded, arguing husband did not demonstrate that any one of the four circumstances listed in MCL 600.5081(2) were present to set aside the arbitration award, and the review husband was requesting is outside the province of the trial court.

The trial court took the matter under advisement and later issued a written opinion denying husband's motion because he failed to establish that any one of the circumstances listed under MCL 600.5081(2) were present, and his motion was "essentially asking [the trial court] to substitute its judgment for that of the arbitrator which is prohibited."

The trial court later issued the judgment of divorce, which "incorporated and merged" the arbitration award and its October 31, 2023, amendment regarding attorney fees. The trial court retained jurisdiction to interpret and enforce the arbitration award, but not to modify it. The judgment of divorce also set out a payment schedule for wife to pay husband the $232,233 she owed him after all marital assets were divided. Wife was ordered to pay husband $75,000 within 60 days of the date the divorce judgment was entered, another $75,000 within 120 days of the date the judgment was entered, and finally, and the remaining $82,233 within 180 days of the date the judgement was entered. Husband now appeals.

## II. ANALYSIS

"Domestic-relations arbitration is governed by the statutory scheme set forth in the domestic relations arbitration act (DRAA)[, MCL 600.5070 *et seq.*]" *Cipriano v Cipriano*, 289 Mich App 361, 367; 808 NW2d 230 (2010). "Judicial review of arbitration awards is usually extremely limited, and that certainly is the case with respect to domestic relations arbitration awards." *Washington v Washington*, 283 Mich App 667, 671; 770 NW2d 908 (2009) (citation omitted). An award arising under DRAA may be vacated only in four very limited circumstances:

(a) The award was procured by corruption, fraud, or other undue means.

(b) There was evident partiality by an arbitrator appointed as a neutral, corruption of an arbitrator, or misconduct prejudicing a party's rights.

(c) The arbitrator exceeded his or her powers.

(d) The arbitrator refused to postpone the hearing on a showing of sufficient cause, refused to hear evidence material to the controversy, or otherwise conducted the hearing to prejudice substantially a party's rights. [MCL 600.5081(2).]

An arbitrator has "exceeded his or her powers" where he or she acts in contravention of controlling principles of law. *Washington*, 283 Mich App at 672. "[T]he party seeking to vacate or modify an arbitrator's award must establish that the arbitrator displayed a manifest disregard of the applicable law[.]" *Krist v Krist*, 246 Mich App 59, 67; 631 NW2d 53 (2001). We review de novo a trial court's ruling on a motion to vacate or modify an arbitration award. *Washington*, 283 Mich App at 671.

### A. THE ARBITRATOR'S AWARD ADEQUATELY ACCOUNTED FOR HUSBAND'S PREMARITAL CONTRIBUTIONS

Husband first argues that the arbitrator made a legal error by failing to compensate him for his contributions to the dental practice from the time the parties met in 2008 to their marriage in 2018. We disagree.

We turn first to husband's argument that the arbitrator committed legal error by failing to consider his premarital contributions to Modern in the arbitration award. Wife is correct that issues with an arbitration award are generally beyond the scope of our review. As we have stated before, "once we have recognized that the arbitrator utilized controlling law, we cannot review the legal

soundness of the arbitrator's application of Michigan law." *Id*. at 674.[1] In husband's brief on appeal, he argues that, although the arbitrator "accurately set forth the relevant governing principle" and "correctly recognized" that a party's separate property can be subject to division in a divorce if the other party contributed to the acquisition, improvement or accumulation of the property, she nonetheless "went badly astray in applying this principle."

More specifically, husband argues that he and wife formed an implied-in-fact contract based on the 12 years he spent managing the business affairs of the two practices. According to husband, he began providing such services in 2009. However, wife did not begin paying husband until after their marriage in 2019, leaving ten years during which time husband was not compensated for his services. Based on what husband was paid between 2019 and 2021, husband estimated that he is owed roughly $312,000. Wife, on the other hand, contended the arbitrator's conclusion that husband had been adequately compensated for his work related to the dental practices prior to the marriage was premised on an unreviewable finding of fact.

The exact nature and scope of husband's contributions to the practice and attendant compensation were highly contested factual issues for which he, in the arbitrator's words, "provided no substantive evidence." However, the arbitrator ultimately concluded, based on the arguments made and evidence presented, that husband had been adequately compensated for his premarital contributions to the practice:

> Husband spent considerable time testifying about and eliciting testimony regarding events dating as far back as 2008, 2012, and 2015. Michigan does not recognize common-law marriages. *Carnes v Sheldon*, 109 Mich App 204, 211, 216-217; 311 NW2d 747 (1981). Cohabitating with someone or dating them is not the same as marrying them. Further, *Bone v Bone*, 148 Mich App 834, 385 NW2d 706 (1986) required the court to look at the period that *began with the marriage*. A trier of fact is not free to expand this period to include any cohabitation that may have occurred before the parties marry. Husband was compensated for his work related to the dental practices prior to the marriage.

Husband is correct that a party may generally recover based on evidence that there was a premarital agreement that was either express or implied in fact. *Featherston v Steinhoff*, 226 Mich App 584, 588; 575 NW2d 6 (1997). However, the arbitrator's express refusal to consider husband's evidence of a premarital implied-in-fact contract was not an error apparent on the face of the award because no argument about the existence of an implied-in-fact contract was ever before her. And because the arbitrator's factual finding that husband had been adequately compensated for his premarital contributions to the practice is beyond the scope of our review, we conclude that

---

[1] Husband contends that an arbitrator's *application* of Michigan law is likewise reviewable, citing *NuVision, Inc v Dunscombe*, 163 Mich App 674, 681; 415 NW2d 234 (1987), citing *DAIIE v Gavin*, 416 Mich 407; 331 NW2d 418 (1982). However, the propositions relied upon by husband appear to us to be dicta. Further still, these cases predate *Washington v Washington*, 283 Mich App 667; 770 NW2d 908 (2009), which we take to be controlling on this issue.

husband has identified no error in the arbitrator's award with respect to his premarital contributions.

## B. NO CONTRACT WAS FORMED BETWEEN THE PARTIES

Husband next argues that, if no implied-in-fact contract can be found, he and wife nonetheless entered into an express contract based on the aforementioned 2015 email. According to husband, wife's email was a genuine contractual offer that he implicitly accepted through his performance of the contract's terms. Wife contends that the email was not a contractual offer but instead consisted of notes based on past conversations between the two of them. According to wife, she never sent the email to husband; rather, wife contends that husband later accessed her email account and forwarded the document to himself.

The arbitrator ultimately concluded that, "[w]hether the email is called a memo, written expression of intent or talking points, it is lacking in the necessary elements of a valid contract and fails the Statute of Frauds." For the reasons explained below, we conclude that, even assuming that conclusion reflects an error, the arbitrator's award would not have been substantially different. *Gordon Sel-Way, Inc v Spence Bros, Inc*, 438 Mich 488, 497; 475 NW2d 704 (1991). The initial arbitrator's award therefore may not be set aside. *TSP Servs v National-Standard, LLC*, 329 Mich App 615, 620; 944 NW2d 148 (2019).

The email fails to create a legally enforceable contract because—even granting for the sake of argument, as the arbitrator did, that the email constitutes an effective offer—husband did not implicitly accept that offer by performing under the contract. "The party seeking to enforce a contract bears the burden of proving that the contract exists." *AFT Mich v Michigan*, 497 Mich 197, 235; 866 NW2d 782 (2015). "Before a contract can be completed, there must be an offer and acceptance. Unless an acceptance is unambiguous and in strict conformance with the offer, no contract is formed." *Kloian v Domino's Pizza LLC*, 273 Mich App 449, 452; 733 NW2d 766 (2006) (quotation marks and citation omitted).

"If an offer does not require a specific form of acceptance, acceptance may be implied by the offeree's conduct." *Pakideh v Franklin Commercial Mortgage Group, Inc*, 213 Mich App 636, 640; 540 NW2d 777 (1995). "[A]n acceptance sufficient to create a contract arises where the individual to whom an offer is extended manifests an intent to be bound by the offer, and all legal consequences flowing from the offer, through voluntarily undertaking some unequivocal act sufficient for that purpose." *Kloian*, 273 Mich App at 453-454 (quotation marks and citation omitted).[2]

According to the arbitrator, "[h]usband provided no substantive evidence" to support his testimony regarding the nature and scope of the services he provided. The arbitrator further found that husband provided no evidence to contradict wife's claim that he never invested money in the practice, and husband does not appear to argue otherwise on appeal.

---

[2] Although husband contends that implicit acceptance is operative when the offeree acts to fulfill "any" of a contract's provisions, he provides no citation in support of that claim.

Whatever the exact nature and scope of husband's work for the dental practice, that work cannot, by itself, constitute the sort of "unequivocal act" sufficient to demonstrate a willingness to be bound by the offer, *Id*. at 454, because, according to husband, he had already been providing those services for over half a decade before the October 16, 2025 email was ever sent. Given husband's additional failure to provide the $37,500 investment also required by the purported contract, we are unpersuaded that husband accepted wife's purported offer, or that wife acquiesced to performance pursuant to any such offer. The purported contract therefore lacked the necessary element of acceptance. *Id*. at 452. Consequently, no legally binding contract was ever formed and, assuming an error in law apparent on the face of the arbitrator's award, the award would not have been substantially different and may not be set aside.[3]

## C. THE ARBITRATOR'S VALUATION OF MODERN WAS NOT ERRONEOUS

Husband next contends that the arbitrator erred by accepting wife's expert's valuation of Modern. According to husband, wife's expert inappropriately based the value of Modern on the sale price of Brite. However, husband argues that, when the owner of a practice intends to continue the practice, the appropriate value of that practice is the value of the practice to the owner as a going concern. *Kowalesky v Kowalesky*, 148 Mich App 151, 157; 384 NW2d 112 (1986). Because wife does not intend to sell Modern, husband argues, the arbitrator erred by accepting a valuation premised on another practice's sale price. We disagree.

Wife is correct that we have established no single method to be uniformly applied in valuing a professional practice. *Id*. at 155.[4] "Rather, this Court will review the method applied by the trial court, and its application of that method, to determine if the trial court's valuation was clearly erroneous." *Id*. at 155-156. In *Kowalesky*, we concluded that the trial court's valuation of a dental practice on the basis of a distress sale and associated 40% reduction in the goodwill[5] value of the practice was inappropriate where nothing in the record supported the assumption that the practice would discontinue. *Id*. at 157. "Since it appears that plaintiff would continue the dental practice," we held, "the valuation of the practice should be the value of the practice as a going

---

[3] Because no binding contract was formed, we need not also decide whether husband, having no license to practice dentistry, is prohibited by law from possessing an ownership interest in the dental practice.

[4] Wife nonetheless attempts to distinguish *Kowalesky* by emphasizing our holding in that case was not made in the context of matrimonial arbitration, but she does not explain the significance of the distinction, nor does it appear to us particularly compelling. Wife is correct to point out that the different procedural postures of *Kowalesky* and this case necessitate different standards of review; however, we are unable to see how an error identified under the clear error standard used in *Kowalesky* would not also be erroneous under the more demanding standard applicable to review of a domestic arbitration award.

[5] Goodwill is defined as "[a] business's reputation, patronage, and other intangible assets that are considered when appraising the business, [especially] for purchase; the ability to earn income in excess of the income that would be expected from the business as a mere collection of assets." *Black's Law Dictionary* (9th ed. 2009).

concern." *Id*. Although *Kowalesky* did not define "going-concern value," Michigan courts have treated the term as synonymous with goodwill value. See *Wayne County v William G Britton and Virginia M Briton Trust*, 454 Mich 608, 625 n 3; 563 NW2d 674 (1997) (noting that the defendants did not claim the taking at issue included "the 'going concern value' of their company, i.e., the company's goodwill"); *City of Lansing v Wery*, 68 Mich App 158, 164; 242 NW2d 51 (1976) (noting that "it is entirely sound to refuse to award as a separate element of damages anything for loss of going-concern value or goodwill"). See also *In re Edward J. Jeffries Homes Housing Project, City of Detroit*, 306 Mich 638, 651; 11 NW2d 272 (1943) ("The loss of good will is not an element of compensation where the business is not taken for use as a going concern."). The holding in *Kowaleski* is consistent with this practice, insofar as the error at issue was the trial court's failure to account for the full goodwill value of the practice and, as a consequence, failure to value the practice as a going concern. *Kowalesky*, 148 Mich App at 157.

The record does not support the conclusion that Brite was sold as if it were going out of business. Indeed, the expert valuation the arbitrator relied on expressly factored goodwill into its valuation of Modern because goodwill "was the main value used in the purchase price for Brite in 2019." As a consequence, husband has failed to identify a legal error apparent on the face of the award with respect to the arbitrator's valuation of Modern.[6]

### III. CONCLUSION

Husband has not identified a legal error apparent on the face of the arbitrator's award with respect to his premarital contributions to the practice, the existence of a contract between the parties, or the arbitrator's valuation of Modern. We affirm.

/s/ Adrienne N. Young
/s/ Stephen L. Borrello
/s/ Christopher M. Trebilcock

---

[6] Husband's argument that the arbitrator erred by failing to account for wife's "manipulation" of the practice's value through a unilateral salary increase for herself is without merit. The arbitrator found that "the testimony of the experts is not consistent with depletion of assets or income of the company." This factual finding is outside the scope of our review. *TSP Servs v National-Standard, LLC*, 329 Mich App 615, 620; 944 NW2d 148 (2019).